1  JASON P. REINSCH (Texas Bar No. 24040120)
2  Email:  reinschj@sec.gov

3  Attorney for Plaintiff
   Securities and Exchange Commission
4  801 Cherry St., Suite 1900
5  Fort Worth, Texas 76102
   Telephone: (817) 900-2601
6  Facsimile: (817) 978-4927

7

8              **UNITED STATES DISTRICT COURT**
               **SOUTHERN DISTRICT OF CALIFORNIA**
9

10

11  SECURITIES AND EXCHANGE          Case No.   **'22 CV0600 TWR WVG**
    COMMISSION,
12
                   Plaintiff,        **COMPLAINT**
13

14        vs.

15  STEVEN CHIANG aka CYRUS
    KONG, ERIC TIPPETTS, JAMES
16  HARDY, and MAURICE "BUTCH"
    CHELLIAH,
17
                   Defendants.
18

19

20        Plaintiff Securities and Exchange Commission ("Commission" or "SEC") files

21  this Complaint against Defendants Steven Chiang a/k/a Cyrus Kong ("Chiang"), Eric

22  Tippetts ("Tippetts"), James Hardy ("Hardy"), and Maurice "Butch" Chelliah

23  ("Chelliah") (collectively "Defendants"), and alleges as follows:

24                              **SUMMARY**

25        1.     This case concerns a two-phased securities fraud perpetrated through the

26  offer, purchase, and sale of two digital asset securities: NASGO Tokens ("NSG

27  tokens") and Sharenode Tokens ("SNP tokens").  Since at least December 2017, as

28  further detailed below, Defendants have defrauded thousands of investors out of more

                                        1

than $10 million in the unregistered offerings of NSG tokens and/or SNP tokens through a series of material misrepresentations and omissions. In addition, Chiang and Tippetts executed a calculated scheme to manipulate the public trading price and volume of the NSG tokens.

2.     In the first phase of the fraud, beginning in at least December 2017, Chiang and Tippetts set the scheme in motion with an unincorporated entity called NASGO that Chiang created and used Tippetts to help launch. Chiang and Tippetts promoted NASGO as a blockchain-based platform where, among other things, clients could utilize the NSG token and create unique websites stored on a blockchain as opposed to a typical computer server, thereby purportedly evading all firewalls and access restrictions. In offering and selling NSG tokens to investors through a general solicitation, Chiang and Tippetts created and disseminated marketing materials that contained material misrepresentations and omissions, such as baseless and unrealistic growth projections as to the value of NSG tokens. For example, Chiang and Tippetts claimed that early investors would receive automatic, consistent payments in NSG tokens that would increase in value as demand for NSG tokens increased, that tens of thousands of clients would be signing up *every* day, and that the number of new clients would grow to millions *per day* in two years.

3.     In investor pitches and YouTube videos, Tippetts went farther, misrepresenting: (1) that the limited, initial offering of the NSG tokens, referred to as the "Founding Delegate" program, was sold out, which misled investors about the number of NSG tokens that had been sold and the money raised in connection with the program; and (2) the amount of NASGO's sales of blockchain-based websites that purportedly generated both revenue and demand for NSG tokens and that would supposedly increase the value of the token. These misrepresentations misled investors about the demand for NASGO and NSG tokens, and, thereby, the value of NSG tokens.

4.     In truth, there was very little demand for NASGO's blockchain platform

2

and NSG tokens, and the factual bases for growth projections were pure fabrications. Chiang and Tippetts concealed this lack of interest in NASGO and NSG tokens by misrepresenting the number of NSG tokens sold.

5.     In the second phase of the fraud, beginning as early as May 2018, Tippetts attempted to generate interest in NASGO and NSG tokens by collaborating with Hardy to create another entity called Sharenode.  Sharenode purported to be "the marketing arm of NASGO" and "powered by NASGO."  Tippetts, along with Hardy, who possessed significant multi-level-marketing ("MLM") experience, worked together to market and sell Sharenode's unregistered digital asset security—the SNP token.  Tippetts and Hardy represented that SNP token owners could receive more tokens by selling NASGO services to small- and medium-sized enterprises ("SMEs").  Sharenode purportedly could help SMEs launch and monetize their own tokens on the NASGO blockchain, as well as create special websites on that blockchain to generate more sales revenue and reach previously unavailable markets.  According to Hardy and Tippetts, Sharenode would create interest in and usage of the NASGO blockchain, thereby generating revenue for NASGO, which, in turn, would increase the value of the NSG token.  To assist with the day-to-day operations of Sharenode, Hardy and Tippetts brought in Chelliah, a longtime associate of Hardy's.

6.     At its core, however, Sharenode was an MLM-style sales program. Tippetts and Hardy conceived it to: (1) market Sharenode and NASGO; and (2) attract businesses to lend credibility to NASGO by launching customized digital assets on the blockchain, which they referred to as "tokenizing."  Ultimately, Chiang, Tippetts, Hardy, and Chelliah would line their pockets with investor funds to use for various personal expenses.

7.     To offer and sell SNP tokens for Sharenode, Tippetts and Hardy created a marketing campaign, which included material misrepresentations and omissions including (1) that Sharenode was on the NASGO blockchain; and (2) that the value of SNP tokens would increase at specified intervals; specifically, a set increase of $0.10

per week and a $0.10 increase for every new business that signed up to use Sharenode's services.  These representations were false because Sharenode was not on the NASGO blockchain, and the value of Sharenode did not increase at the prescribed intervals, nor was there ever a mechanism by which it could do so.  As the faces of Sharenode's marketing campaign, Tippetts and Hardy made these misrepresentations in meetings with investors and in presentations uploaded to YouTube and to Sharenode's social media accounts.  Although Chelliah's primary role was to run the day-to-day operations of Sharenode, he also participated in at least two sales call with investors.  He was at least negligent in not knowing that Sharenode's underlying technology did not function as he, Tippetts, and Hardy represented to investors.

8.      Chiang and Tippetts also schemed to manipulate the price of NSG tokens.  On at least one occasion and upon Chiang's direction, Tippetts transferred funds in support of the scheme to Chiang.  Chiang, Tippetts, and Hardy misused Sharenode investor funds to list the NSG tokens on BitForex, a digital-asset trading platform that is not registered with the SEC as a securities exchange or exempt from such exchange registration.  Chiang, with Tippetts's knowledge and involvement, then initiated a fraudulent trading scheme to manipulate the price and volume of NSG tokens on BitForex.  Chiang hired four individuals working 24-hour shifts to repeatedly buy and sell NSG tokens, thereby giving the false appearance of significant market interest in NSG tokens.

9.      By engaging in this conduct, Defendants violated, and unless restrained and enjoined by the Court will continue to violate, the federal securities laws.  Specifically, they violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77a(c), and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10.      In the interest of protecting the public from any further fraudulent

activity and harm, the Commission brings this action against Defendants seeking: (a) permanent injunctive relief; (b) disgorgement of ill-gotten gains; (c) prejudgment interest on those ill-gotten gains; (d) civil penalties; and (e) all other equitable and ancillary relief to which the Court determines the Commission is entitled.

## <u>JURISDICTION AND VENUE</u>

11.     This case involves the offer and sale of digital asset securities, which are investment contracts, and, thus, securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c].  The definition of "security" includes a range of investment vehicles, including stocks, bonds, and "investment contracts."  Investment contracts are transactions where an individual invests money in a common enterprise and reasonably expects profits to be derived from the entrepreneurial or managerial efforts of others.  In a variety of circumstances, courts have found that investment vehicles other than stocks and bonds constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, airplanes, mobile phones, and enterprises existing only on the Internet.  As the Supreme Court of the United States has noted, Congress defined security broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  Therefore, the Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

13.     Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of California, including

but not limited to Hardy's and Chelliah's misrepresentations, acts, practices, transactions, and courses of business while they were located in San Diego, California. Further, at least two defendants (Hardy and Chelliah) reside in San Diego, California, which is served by this Division.

## THE DEFENDANTS

14.     **Steve Chiang a/k/a Cyrus Kong** is approximately 40-45 years old, a resident of Singapore, and possesses a U.S. Visa. Chiang has never been registered with the Commission or associated with an entity registered with the Commission.

15.     **Eric Tippetts**, 49 years old, is a resident of Dana Point, California. Tippetts is a self-described specialist in personal development and team building. Tippetts has never been registered with the Commission or associated with an entity registered with the Commission.

16.     **James Hardy**, 55 years old, is a resident of San Diego, California. Hardy is self-employed and describes himself as a crypto-enthusiast. Hardy has never been registered with the Commission or associated with an entity registered with the Commission. In 2019, Hardy pled guilty to felony fraud in California for misappropriating investment funds from an elderly client, as part of an unrelated scheme.

17.     **Maurice "Butch" Chelliah**, 56 years old, is a resident of San Diego, California. Chelliah is self-employed. From 2001 through 2013, Chelliah held Series 6, 26, and 63 securities licenses and was associated with several registered broker-dealers from 2000 to 2010. In 2013, the Financial Industry Regulatory Authority ("FINRA") barred Chelliah for mishandling investor funds. Since that time, Chelliah has not been registered with the Commission or associated with an entity registered with the Commission.

## RELATED ENTITIES

18.     **NASGO** is an unincorporated entity that sold tokens and blockchain-based website domains, thereby purportedly allowing clients to integrate the

blockchain into their businesses.  NASGO's products and services featured the NSG token—the unique digital asset for the NASGO blockchain.  Neither NASGO nor the offer or sale of its securities, including the NSG token, are, or have ever been, registered with the Commission, or able to rely on an exemption from the applicable registration requirements.

19.  **Sharenode** is an unincorporated entity that purported to use the NASGO blockchain technology to create digital assets for its clients.  Sharenode marketed that those business-specific digital assets were able to be used to pay for goods or services for the respective businesses or to trade for other digital assets issued through Sharenode.  Sharenode also featured its own unique digital asset—the SNP token. Neither Sharenode nor the offer or sale of its securities, including the SNP tokens, are, or have ever been, registered with the Commission, or able to rely on an exemption from the applicable registration requirements.

## FACTUAL ALLEGATIONS

### A.  NASGO's Formation and the Founding Delegate Program

20.  Chiang began developing the NASGO blockchain in 2015.  Chiang hired software engineers and developers to create the NASGO blockchain and the NSG token, a digital asset native to the NASGO blockchain that was to be used to pay for blockchain-transaction-related fees and awards and to purchase NASGO products and services as described more fully in paragraph 21, below.  By 2017, Chiang was ready to start offering and selling NSG tokens to the public.  To do so, Chiang retained Tippetts, who he had met in 2012, to serve as the face of NASGO's English-speaking marketing efforts.  Thereafter, Chiang and Tippetts publicly held themselves out as the co-founders of NASGO.

21.  Chiang and Tippetts prepared NASGO marketing materials, such as a PowerPoint presentation, YouTube videos, and other information posted on social media platforms, and distributed them to potential investors.  The marketing materials touted the NASGO blockchain as the conduit for businesses to enter the world of

blockchain technology through the sale of NASGO BDomains.  A BDomain—a combination of the words "blockchain" and "domain"—is essentially a website domain on the NASGO blockchain akin to a traditional website domain.  It was the primary product offered by NASGO.  According to marketing materials, the purchase of a BDomain purportedly included a unique, customizable token on a NASGO sidechain,[1] which had a variety of purported uses, including as a medium of exchange for goods and services, and as a means to raise capital from investors.  It also purportedly included the ability to transfer websites from the internet and host them directly on the NASGO blockchain, thereby evading all governmental firewalls.  Chiang and Tippetts told investors that the demand for BDomains would fuel the demand for NSG tokens.  Beginning in May 2018, through a series of YouTube videos that frequently starred Tippetts, written materials they drafted, including a PowerPoint presentation, and an August 2018 live presentation during at least one blockchain convention, Chiang and Tippetts represented to investors that this demand for NSG tokens would, in turn, increase the value of the NSG tokens.  In other words, Chiang and Tippetts promised investors that the demand for BDomains would directly increase the value of NSG tokens, i.e., an increase in the number of BDomains on the NASGO blockchain would increase the value of NSG tokens.

**B.**   **Chiang and Tippetts Marketed NSG Tokens and NASGO in Three Phases**

22.    Between December 2017 and June 2019, Chiang and Tippetts sold NSG tokens in a single offering effectuated in three phases.  The first two phases occurred before the March 2018 launch of the NASGO blockchain.

---

[1] A sidechain is a separate blockchain that is connected to, and runs in parallel with, the primary blockchain.  It is essentially a blockchain attached to another blockchain and information is shared between the two blockchains.

### 1.    Phase One:  Founding Delegate Interests

23.    In December 2017, Chiang and Tippetts began offering and selling NSG token packages to investors.  They referred to these as limited "Founding Delegate" interests.  Chiang purportedly sought out Founding Delegate investors overseas, while Tippetts marketed Founding Delegate interests to investors in the United States. Chiang and Tippetts represented that they were offering 1,000 Founding Delegate interests.  In a video posted on NASGO's website—NASGO.com—in December 2017, Tippetts told investors that the price to purchase a Founding Delegate interest was one bitcoin or 25 Ether.[2]

24.    In exchange for purchasing a Founding Delegate interest, Chiang and Tippetts promised that Founding Delegates would receive 25,000 NSG tokens up-front and that they would receive an annual pro rata share of 8.5 million NSG tokens. These pro rata distributions to Founding Delegates were purportedly generated automatically as fees paid to delegates who verified transactions on the NASGO blockchain.

25.    Tippetts told prospective investors in Founding Delegate interests that the demand for NSG tokens would increase in a variety of ways.  Tippetts told these investors, among other things, that demand for NSG tokens would increase due to: (1) the fact that a limited number of NSG tokens existed; (2) the NASGO BDomains could evade firewalls; and (3) the use of the NASGO blockchain to launch Initial Coin Offerings ("ICOs").  Tippetts knew, or was at least reckless in not knowing, these representations were false.  In addition, Tippetts told investors that the proceeds of NSG token sales would be used to continue the development of the NASGO blockchain, the development of applications hosted on the NASGO blockchain, and for marketing.

---

[2] As of December 20, 2017, one bitcoin was valued at approximately $16,625 and 25 Ether were valued at $20,475.

### 2.    Phase Two:  the "Friends and Family" Program

26.    The second phase of the NSG token offering began in early January 2018 after the Founding Delegate interest program ended.  NASGO began selling NSG tokens through what Tippetts referred to as the "friends and family" program. Notably, many investors were neither friends nor family as they had no prior relationship with anyone associated with NASGO, including presumably the listeners of an entrepreneurship podcast on which Tippetts made the offer.  Tippetts purportedly enlisted Founding Delegates and other investors to solicit potential investors in the friends and family program.  Tippetts falsely claimed in YouTube videos circulated by Twitter, Facebook, and Instagram that NASGO had sold at least 25 million NSG tokens as part of the Founding Delegate program before the launch of the NASGO blockchain.

### 3.    Phase Three: Offering of NSG Tokens to the General Public

27.    Chiang and Tippetts moved into the third phase of the NSG token offering in approximately March 2018 when the NASGO blockchain launched.  In this phase, Tippetts and Chiang began to solicit the general public to invest in NSG tokens via NASGO.com, Telegram, Twitter, Facebook, and YouTube.  Chiang and Tippetts controlled NASGO's social media sites.  A key component of the sales pitch was that NASGO planned to list NSG tokens on a digital asset trading platform, which would create liquidity and a potentially lucrative secondary market where investors could sell their NSG tokens.  According to some investors, the possibility of selling NSG tokens on an "exchange" was a significant consideration in deciding whether to invest.

### C.    Chiang and Tippetts Made Misrepresentations in NASGO Marketing Materials

### 1.    Chiang and Tippetts Baselessly Projected That NASGO Would Be the First Trillion Dollar Blockchain

28.    In May 2018, Chiang and Tippetts created a PowerPoint presentation to

solicit investors to purchase NSG tokens.  Chiang posted the PowerPoint on NASGO.com and Tippetts posted it on Facebook, Twitter, and Instagram.  In at least May 2018 and August 2018, Tippetts also discussed the PowerPoint in various YouTube videos and a speech at a digital asset-focused convention.  A central claim in the PowerPoint was that NASGO would be the world's first *trillion* dollar blockchain.  To calculate this valuation, Chiang and Tippetts projected in the May 2018 PowerPoint that NASGO would reach 10,000 BDomain sales *per day* in 2018, 100,000 *per day* in 2019, and 1 million *per day* in 2020.  At the time Chiang and Tippetts drafted the PowerPoint in May 2018, they knew that NASGO had sold no more than *20 to 30* BDomains *in total* in the United States.  Nonetheless, Chiang and Tippetts wanted to claim that NASGO would be a trillion-dollar blockchain, so they reverse engineered a trillion-dollar valuation, and calculated the annual sales and growth needed to reach that valuation.  They failed to disclose this methodology, or the truth regarding NASGO's insignificant sales at the time they made the claims.  Accordingly, Chiang's and Tippetts's claims in the PowerPoint regarding BDomain sales were made without any reasonable factual basis.

### 2.   *Tippetts's Misrepresentations as to BDomain Sales*

29.   In August 2018, Tippetts appeared at ChainXChange, a "global blockchain exhibition," at the Mandalay Bay Convention Center in Las Vegas. During a presentation, he reiterated that NASGO: (a) would be the first trillion dollar blockchain; (b) would sell 10,000 BDomains per day in 2018; and (c) was "already on pace to do this" and was "ahead of schedule."  But Tippetts knew in August 2018 that NASGO had only sold 20 to 30 BDomains **in total** in the United States, well short of the projected 10,000 **per day** Chiang and Tippetts had been claiming since at least May 2018.  There are no facts or fact-based models that support the claim that NASGO would sell 10,000 BDomains per day in 2018 (or ever).  Further, Tippetts never publicly disclosed the extremely limited number of actual sales or the baseless methodology he used to project BDomains sales, both of which dramatically undercut

the claims he made to investors.

### 3.     Tippetts's Founding Delegate Misrepresentations

30.     Tippetts also misrepresented the number of Founding Delegate interests that NASGO had sold, in an apparent effort to overstate public interest in NASGO and, more importantly, the NSG tokens.  On January 8, 2018, shortly after the offering of Founding Delegate interests concluded, Tippetts sent a voice message to Chiang via WeChat, an encrypted messaging app, stating that he had "no clue how we ended up on [sales for the] delegate program."  Similarly, during the time between the close of the offering of Founding Delegate interests and the offerings of NSG tokens to investors, Tippetts never received any updated information from Chiang (or anyone else) regarding how many Founding Delegate interests they had sold. Nevertheless, four months later, on May 4, 2018, Tippetts published a YouTube video in which he claimed the Founding Delegate interests were sold out.  Because the cost of a Founding Delegate interest was one bitcoin or 25 Ether, if Tippetts's representation about sales of Founding Delegate interests was true, NASGO would have raised between $6.8 million and $19.9 million.  Such amounts would have demonstrated significant investor interest and provided significant capital to support NASGO's ongoing development and marketing efforts.

31.     However, Tippetts knew, or was at least reckless in not knowing, this claim—that the Founding Delegate interests were sold out—was false.  He knew that, in reality, NASGO only sold approximately 40 Founding Delegate interests in the United States—4% of what he publicly claimed—which raised no more than $837,000.  Tippetts knew this, among other things, because he was responsible for sending invitations for a July 2018 Founding Delegate call that he hosted.  Tippetts sent only 42 email invites for that call – a far cry from 1,000 Founding Delegates he had promised.  Despite that knowledge, on the July 2018 call, Tippetts again falsely claimed that all 1,000 Founding Delegate interests had "sold out very quickly."  The misrepresentations regarding Founding Delegate and BDomain sales vastly

overstated the level of investor interest and the money raised in the offering by
several orders of magnitude.  Thus, the misrepresentation enabled Chiang and
Tippetts to continue reaping proceeds from the fraudulent NSG token offering.

32.    Because of Chiang's and Tippetts's numerous public statements before
the public sale, including statements about the profitability and tradability of NSG
tokens, Chiang's and Tippetts's importance to the NSG project, Chiang's, Tippetts's,
and NASGO's intent to profit from the appreciation of NSG tokens, and Chiang and
Tippetts's planned future actions to support NSG tokens, investors who bought NSG
tokens reasonably would have expected future profits to be derived from the
entrepreneurial and managerial efforts of Chiang, Tippetts, and their agents.

**D.    Sharenode**

33.    By May 2018, Chiang and Tippetts realized that, despite their efforts to
drive interest in NSG tokens, sales were slowing down and they needed help raising
money and driving demand for NSG tokens and the NASGO blockchain.  To address
this issue, Tippetts and Hardy created Sharenode, which they initially described as
"the marketing arm of NASGO," and later as "powered by NASGO."

34.    Sharenode functioned as the MLM-like sales arm for the NASGO
ecosystem, incentivizing individuals to invest in SNP tokens (discussed in more detail
below) both through the promise of increases in the value of the SNP token and the
payment of sales commissions to investors who recruited new Sharenode investors or
businesses that tokenized on the NASGO blockchain.  In May and June 2018 WeChat
messages, Chiang and Tippetts discussed—and ultimately Chiang approved of—the
creation of Sharenode.  Tippetts and Hardy controlled Sharenode, including
controlling and directing the use of investor proceeds and dictating investor-related
content.  Tippetts also controlled the Sharenode digital asset wallet, which held
bitcoins sent by investors to purchase SNP tokens.  In addition, Tippetts supported
Hardy's efforts to spearhead Sharenode's sales program.  Hardy was both an NSG
token owner and experienced in MLM programs.

35.     In June 2018, Tippetts collaborated with Hardy to create a single-page summary of the Sharenode offering.  Tippetts disseminated the summary to a limited number of people initially, but that summary subsequently became the basis for offering materials published on Sharenode's website, Sharenode.com.  Hardy promoted the Sharenode offering based upon the terms in the initial summary.  The summary, and later Sharenode.com, contained representations that each SNP token holder would also automatically receive NSG tokens.  According to Tippetts and Hardy, these NSG token distributions would occur on a daily basis.  Thus, a central part of their sales pitch to prospective investors was that owning SNP tokens generated profits in the form of NSG tokens.  Tippetts also stated in a June 2018 video that he decided to create this Sharenode program to provide investors a way to earn NSG tokens and other tokens on the NASGO blockchain.  Hardy sent Tippetts's video to investors and people who could recruit investors.

36.     During a July 29, 2018 investor call, Hardy stated to SNP token investors that the NSG token benefit was "the goose that lays the golden eggs." During this call, and at least one subsequent investor call in January 2019, Hardy also told investors that SNP tokens could be sold or exchanged at some point in the future. Indeed, Sharenode's website, which Tippetts controlled, stated "if you ever want to sell your SNP tokens, you can.  They are yours to allocate where and when you want to."

37.     Beyond the sales of SNP tokens, Sharenode offered what can best be described as marketing packages in which businesses could issue their own unique digital assets, which purchasers could then use to buy goods or services for that respective business, or to trade for other digital assets issued through Sharenode. Hardy and Tippetts claimed that sales of these marketing packages would drive demand for SNP tokens and the NASGO blockchain, which would, in turn, increase the value of SNP tokens.

38.     Tippetts and Hardy created Sharenode marketing materials and provided

them to prospective investors.  Hardy, with Tippetts's knowledge, hosted daily training calls for Sharenode sales reps and existing SNP token investors, explicitly encouraging Sharenode salespeople and existing SNP token investors to invite potential investors to listen to the calls.  Once Sharenode was "launched" in June 2018, the expectation of profits fueled by Tippetts's and Hardy's misrepresentations attracted significant numbers of investors who invested, according to Hardy, more than $10 million.

39.    As investor interest in Sharenode increased, Hardy and Tippetts brought in Chelliah, a former business associate, to become Sharenode's *de facto* chief operating officer.  In this role, Chelliah trained sales personnel and opened and ran Sharenode's physical office.  Chelliah provided the administrative structure that allowed Hardy and other salespeople to focus on attracting new investors; thus, Chelliah's role was crucial in increasing SNP token sales.  In addition, in November 2018 and on May 7, 2019, Chelliah participated in calls with investors and prospective investors where he misrepresented that Sharenode was connected to the NASGO blockchain.

**E.    Misrepresentations Regarding Sharenode**

40.    Tippetts and Hardy worked together to develop the sales pitch for Sharenode, which included multiple material misrepresentations.  First, Tippetts and Hardy, through published marketing materials and in oral pitches to investors, misrepresented the projected value of SNP tokens.  Second, Hardy and Chelliah, with Tippetts's knowledge and approval, misrepresented to investors that Sharenode and SNP tokens were "on the blockchain."

**1.    *Misrepresentations as to SNP Tokens and NSG Token Rewards***

41.    Tippetts and Hardy created the Sharenode marketing materials, which focused on two aspects of the supposed value of SNP tokens: (1) fixed increases in the value of SNP tokens; and (2) NSG token rewards to SNP token holders.  First, Tippetts and Hardy promised that SNP tokens, which were initially sold to investors

at $0.10 per token, would *automatically* increase in price by $0.10 for each new business that signed up to tokenize with NASGO. This claim was false. At the time they made the statement, there was no automated system or software in place to ensure such increase; rather, increases were made manually at the instruction and discretion of Tippetts and Hardy. This promise of set increases in SNP token value was demonstrably false, because, by December 2018—despite public claims that Sharenode had signed up over 300 businesses—the price of the SNP token never exceeded $1.00, and never came close to the $30.00 (or more) value that the SNP tokens should have reached given the claimed number of businesses that had allegedly tokenized by that date.

42. Tippetts and Hardy also promised investors—both orally and in writing—that the SNP token would increase by $0.10 per week, which also did not occur. In fact, this representation by Tippetts and Hardy lacked any reasonable basis when it was made. From the outset, the value of the SNP token was fabricated by Tippetts and Hardy, and the represented increase in value never materialized for investors. In fact, within the first few months of the June 2018 launch, without any announcement to investors, Tippetts and Hardy stopped increasing the price at which they sold SNP tokens.

43. Second, Tippetts and Hardy also promised SNP token investors that they would receive rewards in the form of a pro rata share of the NSG tokens generated each month. Tippetts also publicly promised Sharenode investors a pro rata share of 50 million NSG tokens from Tippetts's and Chiang's own wallets that would be paid out over approximately one year to further incentivize the purchase of Sharenode tokens. However, most SNP token holders never actually received these rewards. SNP token holders could sign in to the Sharenode user website, known as the "back office," which showed their NSG token balances purportedly increasing. As a result, most SNP token holders believed they were getting regular additions of NSG tokens based on these promises and what their back office showed them. In reality, as

discussed in paragraph 55, below, many SNP token holders were never able to withdraw or sell their NSG tokens.  This eliminated any opportunity for SNP token holders to monetize their investments in Sharenode, thereby rendering their purportedly valuable tokens inaccessible and valueless.

### 2.  Misrepresentations That SNP Tokens Were on the Blockchain

44.     A central feature of a "blockchain" is that it is an immutable database; i.e., data already on the blockchain cannot be manipulated, lost, or overwritten.  The owner of assets on a blockchain can move or transfer them in any way they see fit.  The Sharenode marketing materials created by Tippetts and Hardy, and disseminated to investors, claimed that Sharenode was "on the blockchain."  In addition, Hardy publicly repeated the blockchain claim to current and prospective investors on multiple occasions, including on a training call on May 2, 2019.  On a May 7, 2019 investor call, Chelliah made the claim as well.

45.     However, this claim was simply not true; rather, it was an attempt by Tippetts, Hardy, and Chelliah to capitalize on the popular buzzword "blockchain."  In reality, Sharenode stored all SNP token transaction data in a database stored on a single server and accessible to investors only by logging into their account on the Sharenode website.  Although Sharenode investors could see their NSG token balances increasing, those transactions were not recorded on the NASGO blockchain.  Further, unless investors had the tokens in a NASGO wallet, investors could not withdraw or sell their purported balance of NSG tokens without approval from Tippetts, who had to manually authorize any NSG token distribution process, with rewards paid out of a wallet that Tippetts controlled, as opposed to the automated operation of the NASGO blockchain or from a NASGO rewards treasury.

46.     Sharenode's outside web developers, as well as Hardy, knew that SNP token transactions were not recorded on any blockchain.  Chelliah was at least negligent in not knowing that SNP token transactions were not recorded on any blockchain.  As early as August 2018, Sharenode's support email address received

numerous complaints from SNP token holders because the balances for the SNP and NSG tokens, as reported on the investors' web-based account statements, were incorrect. These emails were then forwarded to Hardy at his personal email address. These errors would not have been possible had SNP token transactions actually been recorded on an immutable blockchain, as Tippetts and Hardy claimed. Hardy, who held himself out as the co-founder of Sharenode, knew, or was reckless in not knowing, that Sharenode was not attached to any blockchain. Chelliah acted at least negligently by making the Sharenode blockchain misrepresentation on a May 7, 2019 investor call. Chelliah knew the Sharenode blockchain feature was not functional because he received numerous investor complaints about incorrect token balances. In fact, Chelliah openly doubted Sharenode's technology since the beginning of his involvement with Sharenode.

47.     Because of Tippetts's, Hardy's, and Chelliah's numerous public statements before the public sale of SNP tokens, including statements about the profitability and tradability of SNP tokens, Hardy's, Tippetts's, and Chelliah's own importance to the Sharenode project, Hardy's, Tippetts's, Chelliah's, and Sharenode's intent to profit from the appreciation of SNP tokens, and Sharenode's planned future actions to support SNP tokens, investors who bought SNP tokens reasonably would have expected future profits to be derived from the entrepreneurial and managerial efforts of Hardy, Tippetts, and their agents.

### F.     Defendants Misappropriated Investor Funds.

48.     Sharenode and NASGO never had dedicated corporate bank accounts. Instead, millions of dollars from investors flowed into numerous bank accounts and cryptocurrency wallets directly controlled by Tippetts, Hardy, Chelliah, and others, as well as Hardy's PayPal account. Some of these were personal accounts owned by each of the Defendants. Other bank accounts and cryptocurrency wallets were ostensibly opened by Tippetts, Hardy, or Chelliah for their respective non-Sharenode business interests. An analysis of the activity in these accounts reveals that Tippetts

received at least $1.5 million of proceeds from Sharenode and NASGO investor funds, Hardy kept at least $1.3 million, and Chelliah kept over $200,000. They used these misappropriated funds for mortgage payments, car purchases and leases, credit card payments, personal loan payments, and various living expenses. Additionally, Tippetts caused the transfer of hundreds of bitcoins to wallets purportedly controlled by Chiang. In WeChat messages dated December 15, 2018 and January 17, 2019, Chiang acknowledged receiving more than $1 million of Sharenode investor funds from Tippetts.

### G. The Market Manipulation of NSG Tokens

49. In October 2018, Tippetts and Chiang began a series of meetings with BitForex, a digital asset trading platform with offices in Hong Kong, Singapore, and Shenzhen, China. BitForex is not registered as a national securities exchange in the United States, and did not have an exemption from such registration that would cover the availability of their trading platform with persons in the United States. The purpose of these meetings was to get NSG tokens listed on the BitForex platform. In theory, this listing would allow NSG token holders to sell and trade their digital securities with other market participants. BitForex charged NASGO at least 100 bitcoins—at the time valued at approximately $615,000—to list the NSG token on its platform. Unbeknownst to Sharenode investors, Tippetts and Chiang used at least 50 bitcoins from Sharenode investors to pay BitForex to list the NSG tokens. Although Sharenode investors were told that proceeds from SNP token sales would be used for marketing and technological development, Tippetts and Hardy never told the Sharenode investors that their funds would be used to list NSG tokens on BitForex. To that end, in October 2018, Tippetts sent 50 bitcoins to Chiang from a Sharenode bitcoin wallet that Tippetts controlled. In turn, Chiang paid the BitForex listing fee using these bitcoins.

50. Before NSG tokens went live on BitForex on January 19, 2019, Chiang and Tippetts also set aside at least 83 bitcoins from Sharenode investors. In reality,

Chiang and Tippetts intended for these funds to be used to manipulate the price and volume of NSG token trading on BitForex. Chiang and Tippetts often communicated via WeChat. In those WeChat exchanges, Chiang explained to Tippetts what he meant by "market making." For example, on January 26, 2019, Chiang wrote to Tippetts:

> I have market making team of 4 people. They work 24hrs shift [*sic*] to do it dude…Right now our market cap is abt 300-400m usd so it will be top 20...We have to constant [*sic*] keep this for 100 days then we can get into coinmarket cap[3]

51.     Chiang further explained on January 26, 2019:

> With the market making, soon more and more people in the public then the world will see the numeric value of NSG…so with us maintaining at the current price range…market should start buying NSGs and compete for deloegates [*sic*]

52.     Thus, Tippetts knew that Chiang controlled and manipulated the price and volume of NSG tokens. Tippetts also knew that Chiang and his market makers were the "biggest players" in transacting NSG tokens on BitForex, yet no one associated with NASGO ever told investors that the overwhelming majority of NSG token trading on BitForex was done by Chiang and his team.

53.     Chiang's market makers began manipulating the price of NSG tokens as soon as the token launched on BitForex on January 19, 2019. Although Chiang's market makers were initially successful in stabilizing and increasing the price of NSG tokens on BitForex, contributing largely to trading volumes that averaged more than $2.5 million per day during the first 60 days of trading, this facade did not last. As noted above in paragraph 43, a key component of Tippetts's, Hardy's, and Chelliah's

---

[3] CoinMarketCap is a website that lists and ranks digital assets by value and trading volume, and being included in that list is seen by some as an indicia of legitimacy. *See* www.coinmarketcap.com.

Sharenode sales pitch was the purported opportunity to earn NSG token rewards, which could be monetized by selling them on BitForex. In early April 2019, after some SNP token holders began selling their NSG tokens on BitForex, Chiang sent a WeChat message to Tippetts berating him for allowing these sales. These sales flooded the market with so many NSG tokens that Chiang's market makers could not absorb the NSG tokens while still maintaining the price of NSG tokens. On April 4, 2019, Tippetts wrote to Hardy:

> Just spoke to steve [Chiang]...he is very concerned we don't have the funds to stabilize NSG as the NSG we are sending out people are selling at approx $150-$300k a day. Steve's running out of money and can't pay developers and keep market moving up.

54.   On April 22, 2019, Tippetts sent an iMessage to Hardy stating:

> Steve pounded me again last night on still pushing withdrawals and keeps crashing NSG. They are basically selling and it's coming out of Steve's pocket from market makers. I have to send smaller chunks.

55.   Chiang continued to complain to Tippetts about Sharenode investors selling NSG tokens on BitForex. By May 3, 2019, Chiang and Tippetts halted all NSG token withdrawals from the wallets of SNP token holders. Hardy knew that Tippetts directed that an email be sent to all holders of NSG tokens, which stated that "sell-offs" would make NSG tokens "rapidly unstable." Accordingly, NSG token holders were told via a mass email that they would not be able to withdraw their NSG tokens until "at least Q3 of 2019." As Hardy knew, "that freeze never unfroze," leaving Sharenode and NASGO investors unable to access or sell their NSG tokens.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

### *(Against Chiang, Tippetts, and Hardy)*

56.     The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

57.     Among other things, Chiang and Tippetts made various material misrepresentations and omissions during their NSG token offering.  They made baseless claims that NASGO would be the first trillion dollar blockchain platform by fabricating projections that NASGO would sell 10,000 BDomain sales *per day* in 2018, 100,000 *per day* in 2019, and one million *per day* in 2020.  Chiang and Tippetts knew at the time of these representations that NASGO had sold a grand total of 20 to 30 BDomains in the United States.  Tippetts also misrepresented that the Founding Delegate interests had sold out, thereby giving the false appearance of increasing demand and utilization of NSG tokens, as well as the false appearance of significant money raised to pay for ongoing development and marketing.

58.     As also further detailed above, Tippetts and Hardy made numerous material misrepresentations and omissions in the SNP token offering.  First, Tippetts and Hardy, through both published marketing materials and in oral pitches to investors, misrepresented the projected value of SNP tokens.  Second, Hardy, with Tippetts's approval, misrepresented to investors that Sharenode and SNP tokens were "on the blockchain."

59.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, knowingly or recklessly:

a.   employed devices, schemes, or artifices to defraud; and/or

22

b.  made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

60.  By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

### (Against All Defendants)

61.  The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

62.  Among other things, Chiang and Tippetts made various material misrepresentations and omissions during their NSG token offering.  They made baseless claims that NASGO would be the first trillion dollar blockchain platform by fabricating projections that NASGO would sell 10,000 BDomain sales *per day* in 2018, 100,000 *per day* in 2019, and 1 million *per day* in 2020.  Chiang and Tippetts knew at the time of these representations that NASGO has sold a grand total of 20-30 BDomains in the United States.  Tippetts also misrepresented that the Founding Delegate interests had sold out, thereby giving the false appearance of increasing demand and utilization of NSG tokens.

63.  As also further detailed above, Tippetts, Hardy, and Chelliah made various material misrepresentations and omissions in their SNP token offering.  First, Tippetts and Hardy, through both published marketing materials and in oral pitches to investors, misrepresented the projected value of SNP tokens.  Second, Hardy and Chelliah, with Tippetts's approval, misrepresented to investors that Sharenode and

SNP tokens were "on the blockchain," which was false.

64.     By engaging in the acts and conduct alleged herein, Chiang, Tippetts, and Hardy, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

      a.    knowingly or recklessly employed a device, scheme, or artifice to defraud; and/or

      b.    knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c.    knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

65.     By engaging in the acts and conduct alleged herein, Chelliah, directly or indirectly, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, has:

      a.    at least negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      b.    at least negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

66.     By reasons of the foregoing, Chiang, Tippetts, and Hardy have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15

U.S.C. § 77q(a)].

67.     By reasons of the foregoing, Chelliah has violated, and unless enjoined will continue to violate, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2), (3)].

## THIRD CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and (c) of the Securities Act

### [15 U.S.C. §§ 77e(a) & (c)]

### *(Against All Defendants)*

68.     The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

69.     Between December 2017 and June 2019, the Defendants collectively raised approximately $10 million by offering and selling NSG tokens and SNP tokens to persons throughout the United States.  However, neither the offer or sale of NSG tokens nor the offer or sale of SNP tokens were ever registered with the Commission, nor able to rely on an exemption from registration.

70.     By engaging in the conduct described herein, Defendants, directly or indirectly:

      a.     made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect;

      b.     for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or

      c.     made use of means or instruments of transportation or

communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement had been filed.

71.     By reasons of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

a.     Making findings of fact and conclusions of law that Defendants committed the alleged violations;

b.     Permanently enjoining Chiang, Tippetts, and Hardy, pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

c.     Permanently enjoining Chelliah, pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, from violating Sections 5(a), 5(c), and 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(2), (3)];

d.     Permanently enjoining Chiang, Tippetts, and Hardy, pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, from participating, directly or indirectly, in any offering of securities, including any digital asset security; provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own personal accounts;

e.     Ordering Defendants to disgorge all ill-gotten gains they received as a

26

1   result of the conduct alleged herein, together with pre-judgment interest;

2   f.   Ordering Chiang, Tippetts, and Hardy to pay civil penalties under

3        Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section

4        21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

5   g.   Ordering Chelliah to pay civil penalties under Section 20(d) of the

6        Securities Act [15 U.S.C. § 77t(d)];

7   h.   Retaining jurisdiction of this action in accordance with the principles of

8        equity and the Federal Rules of Civil Procedure in order to implement

9        and carry out the terms of all orders and decrees that may be entered, or

10       to entertain any suitable application or motion for additional relief within

11       the jurisdiction of this Court; and

12  i.   Granting such other and further relief as this Court may determine to be

13       just and necessary.

14  Dated:  April 28, 2022                    _s/Jason P. Reinsch_

15                                            Jason P. Reinsch
                                              Attorney for Plaintiff
16                                            Securities and Exchange Commission

17

18

19

20

21

22

23

24

25

26

27

28